**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| **ELIZABETH REISNER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Civil Action File No.____________** |
| **v.** | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| **CITY OF SUWANEE, GEORGIA, MARTY ALLEN, and ROBYN O'DONNELL, in their individual capacities,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**<u>COMPLAINT FOR EQUITABLE RELIEF AND DAMAGES</u>**

Plaintiff Elizabeth Reisner brings this Complaint seeking damages and equitable relief against the City of Suwanee, Georgia ("Suwanee" or "the City"), and Marty Allen and Robyn O'Donnell in their individual capacities (collectively "Defendants") showing the Court as follows:

**<u>Jurisdiction and Venue</u>**

1. This Court has original jurisdiction over Plaintiffs' federal claims pursuant to 28 U.S.C. § 1331; jurisdiction over the state claims arises under 28 U.S.C. § 1367.

2. This is a lawsuit for equitable relief and monetary damages based on the retaliatory termination of Elizabeth Reisner by Defendants in violation of the Georgia Whistleblower Act, O.C.G.A. § 45-1-4 *et seq.* ("GWA") and the First

Amendment, thus, subject matter jurisdiction is proper in this Court.

3. Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391 as the unlawful employment practices alleged in this Complaint were committed in this district and division.

**The Parties**

4. Ms. Reisner is a resident of Gwinnett County, Georgia and submits herself to the jurisdiction of this Court.

5. Ms. Reisner was employed by the City of Suwanee as a Prosecutor since January 2008 and, at the time of Defendants' termination of her employment on January 28, 2026 was the Chief Prosecutor for the City of Suwanee's Municipal Court.

6. At all times relevant, Ms. Reisner was a "public employee" as defined by the GWA, O.C.G.A. § 45-1-4(a)(3).

7. Defendant City of Suwanee, Georgia is a municipality located in Gwinnett County, Georgia.

8. Defendant City of Suwanee, Georgia is a "public employer" as defined by the GWA, O.C.G.A. § 45-1-4(a)(4).

9. The City of Suwanee is responsible for the policies, procedures, and practices implemented through its various agencies, agents, departments, and employees, and for injury occasioned thereby and was the public employer of Plaintiff

Reisner at all times material hereto.

10. The City of Suwanee, Georgia may be served with process pursuant to Rule 4 of the Federal Rules of Civil Procedures by service on Mayor James M. Burnette, 330 Town Center Avenue, Suwanee, Georgia 30024 or City Manager Marty Allen, 330 Town Center Avenue, Suwanee, Georgia 30024.

11. Defendant Marty Allen, Suwanee City Manager, is subject to this Court's jurisdiction and may be served with process pursuant to Rule 4 of the Federal Rules of Civil Procedures by service at 330 Town Center Avenue, Suwanee, Georgia 30024.

12. Defendant Robyn O'Donnell, Suwanee City Clerk, is subject to the jurisdiction of this Court and may be served with process pursuant to Rule 4 of the Federal Rules of Civil Procedures by service at 330 Town Center Avenue, Suwanee, Georgia 30024.

## Factual Allegations

13. Plaintiff Elizabeth Reisner began her employment with the City of Suwanee, Georgia (the "City") on January 1, 2008, and served continuously until January 28, 2026.

14. At the time of her termination, Ms. Reisner served as the City's Chief Prosecutor.

15. As Chief Prosecutor, Ms. Reisner supervised Assistant Prosecutors Phil

Pilgrim, Kelsea Wiley, and Richard Armond.

16. Ms. Reisner consistently excelled at her job throughout her employment.

17. Ms. Reisner received City performance awards in 2019 and 2022.

18. Ms. Reisner's HOPE diversion program received recognition from the Georgia Municipal Court Clerks' Council in 2017.

19. Ms. Reisner was never disciplined or counseled regarding her performance or conduct during her employment with the City.

20. Chief Judge Norman Cuadra served as the Chief Judge of the Suwanee Municipal Court during the relevant period.

21. Judge Cuadra supervised the Municipal Court's Associate Judges.

22. In June 2021, Judge Cuadra recommended the City hire Phil Pilgrim as an Assistant Prosecutor.

23. Mr. Pilgrim was a partner with Banks, Stubbs & McFarland, while simultaneously serving as a Suwanee prosecutor.

24. Banks, Stubbs & McFarland regularly represented criminal defendants appearing before the Suwanee Municipal Court.

25. On October 10, 2024, Judge Cuadra proposed creating a fictitious criminal defendant for the purpose of obtaining a fabricated review of the Municipal Court.

26. City Clerk Robyn O'Donnell participated in planning the fictitious defendant scheme.

27. Clerk of Court Jenessa Cephacile also participated in planning the scheme.

28. On or about October 11, 2024, Ms. O’Donnell, Judge Cuadra, and Ms. Cephacile exchanged emails discussing the implementation of the fictitious defendant scheme

29. Ms. Cephacile and Judge Cuadra proposed three fake defendants to Ms. O’Donnell and Ms. O’Donnell said she wanted all three fake defendants to perpetrate a fraud on the court.

30. On October 17, 2024, the City officials scheduled a meeting to discuss the logistics of implementing the fictitious defendant plan.

31. On December 5, 2024, Judge Cuadra, Ms. O’Donnell, and Ms. Cephacile met to finalize the logistics of the scheme.

32. On or about January 6, 2025, a fraudulent citation was created in the name of a false defendant, “Juana Venado,” for selling ice cream in the park.

33. The fraudulent citation was signed by Officer Busino,

34. A police report was also created concerning the fictitious incident.

35. Clerk Cephacile entered the fictitious citation and police report into the City’s court records, thereby creating fraudulent public records.

36. Those records became part of the official Municipal Court records.

37. On January 28, 2025, Alma Carranza, who was solicited by and is a personal friend of Judge Cuadra, appeared in afternoon court fraudulently representing herself as defendant "Juana Venado" to court staff, prosecutors, and Judge White.

38. Ms. Carranza falsely claimed she could not speak English.

39. Ms. Reisner met with Ms. Carranza in her capacity as Chief Prosecutor to make a plea recommendation.

40. Ms. Carranza then entered a plea before Associate Judge White using an interpreter and signed court documents under the fictitious identity.

41. On January 29, 2025, Ms. Cephacile and Ms. O'Donnell emailed Judge Cuadra calling the fraud on the court a "success."

42. Ms. Cephacile confirmed that Officer Busino was creating a new ticket and report for a second fraudulent defendant the group was planning to schedule in furtherance of the fraudulent scheme.

43. Judge Cuadra and Ms. Carranza agreed that Ms. Carranza would appear a second time as the fraudulent defendant to perpetrate another fraud on the court.

44. On April 15, 2025, at a court meeting that included Ms. Reisner and Prosecutor Armond, Judge Cuadra told staff about the "fake defendant" scheme.

45. Immediately following the meeting, Ms. Reisner reported to Ms.

O’Donnell that she believed the fraudulent defendant scheme was unethical.

46. Ms. O'Donnell denied knowing how the scheme had been carried out.

47. Following Ms. Reisner’s report, Ms. O’Donnell became noticeably distant and unfriendly toward Ms. Reisner.

48. On April 17, 2025, Ms. O’Donnell told Ms. Cephacile that Judge Cuadra had asked her to speak with Ms. Reisner about the fraudulent defendant’s feedback even though it was an ethics violation for a judge to take supervisory action against a prosecutor.

49. On or about May 27, 2025, Ms. Reisner told Ms. O’Donnell that the fraudulent defendant scheme violated both ethical rules and the law.

50. Ms. Reisner further reported that she felt harassed by Judge Cuadra’s efforts to supervise her through the use of a fabricated defendant and fraudulent review.

51. Ms. O’Donnell told Ms. Reisner that she was pleased Ms. Reisner had reported the matter and denied participating in the fraud.

52. Ms. O’Donnell said that she wanted to prevent Judge Cuadra from repeating the scheme.

53. Ms. O’Donnell shared with Ms. Reisner that Judge Cuadra was planning to commit the fraud scheme again with Ms. Carranza and suggested Ms. Reisner meet with Judge Cuadra to prevent it.

54. Ms. Reisner agreed to meet with Judge Cuadra provided Assistant Prosecutor Richard Armond attended the meeting.

55. After making this report, Ms. Reisner observed that Ms. O'Donnell's treatment of her became increasingly hostile.

56. On June 12, 2025, Ms. Reisner met with Judge Cuadra regarding the fraudulent defendant scheme.

57. Ms. O'Donnell, Ms. Cephacile, and Mr. Armond also attended the June 12, 2025 meeting.

58. Ms. Reisner told Judge Cuadra she was uncomfortable with the fraudulent defendant scheme and was concerned it violated laws governing the Georgia Crime Information Center and ethics rules.

59. Judge Cuadra indicated that he believed the scheme had been successful.

60. Judge Cuadra denied violating any law or ethical rule.

61. Judge Cuadra refused to discontinue the practice.

62. Following the meeting, Ms. Reisner advised Ms. O'Donnell that she remained concerned that Judge Cuadra would continue engaging in unlawful and unethical conduct.

63. Ms. Reisner's concerns remained unresolved following the June 12, 2025 meeting.

64. On June 15, 2025, Ms. Reisner reported Judge Cuadra's conduct to the Judicial Qualifications Commission ("JQC").

65. Ms. Reisner reported the fictitious defendant scheme to the JQC because she reasonably believed it violated Georgia law and judicial ethics rules and regulations.

66. The JQC opened an investigation into Ms. Reisner's complaint.

67. Investigator Jonathan McFarland was assigned to investigate Ms. Reisner's complaint.

68. On or about July 8, 2025, Ms. Reisner was contacted at work by a JQC investigator regarding her complaint.

69. On or about July 8, 2025, Ms. Reisner told her assistant and lead bailiff, Jason Phillips that the JQC investigator called her at about the "fake defendant" scheme to ask more questions.

70. Ms. Reisner told Ms. O'Donnell that she spoke with a JQC investigator about Judge Cuadra.

71. Ms. Reisner told Ms. O'Donnell she was uncomfortable at work, afraid of losing her job, and was feeling anxiety and having problems sleeping because of the situation.

72. When Ms. Reisner told Ms. O'Donnell that she was afraid that Judge Cuadra would find out about her JQC complaint, Ms. O'Donnell stated, "well he

brought this on himself," continuing to maintain she was not involved in the fraud.

73. After learning of Ms. Reisner's JQC complaint, Ms. O'Donnell became noticeably colder toward Ms. Reisner and avoided eye contact with her.

74. Between July 9 and July 18, 2025, Ms. Reisner reported Judge Cuadra's illegal and unethical conduct to City Attorney Gregory Jay.

75. Ms. Reisner told Mr. Jay that she felt harassed by Judge Cuadra's attempt to supervise her and solicit a fraudulent review.

76. Ms. Reisner told Mr. Jay the City should investigate the fraud and ensure that laws and ethics were adhered to by the judge and others.

77. Ms. Reisner asked Mr. Jay if City Manager Marty Allen was aware of Judge Cuadra's misconduct.

78. Mr. Jay said that Mr. Allen was aware of Judge Cuadra's conduct, that Mr. Jay had a meeting with Mr. Allen and Ms. O'Donnell, and that they believed "what Cuadra did wasn't cool, but we can't do anything about it."

79. On August 13, 2025, attorney Jim Wall sent Mr. Allen a glowing report regarding the City's Municipal Court, Ms. Reisner, and Mr. Armond stating in part, "Elizabeth Reisner and Richard Armond are exceptional. I've dealt with both attorneys for years and cannot say enough good things about them. Elizabeth is very knowledgeable, decisive and moves a big caseload very efficiently. She's been in the job for years and is really, really good at it. She represents Suwanee very well."

80. On August 18, 2025, Ms. O'Donnell advised Mr. Wall that she and Mr. Allen agreed with his assessment of Ms. Reisner.

81. On August 15, 2025, Mr. Allen sent an email announcing that he was creating a new Court Administrator position that would report to Ms. O'Donnell at City Hall and supervise non-appointed court staff.

82. In October 2025, Kim Brock was hired as the new Court Administrator.

83. Ms. Reisner met with Ms. Brock at Ms. O'Donnell's request to fill her in on what was going on with the court since Ms. Brock was hired to clean up the court issues.

84. Ms. Reisner complied with Ms. O'Donnell's request and reported the fraudulent defendant issue to Ms. Brock, explaining that the issue made she and Mr. Armond uncomfortable.

85. Ms. Reisner made these disclosures because she reasonably believed the conduct violated Georgia law and applicable ethical rules.

86. During 2025, Ms. Reisner also reported concerns regarding Assistant Prosecutor Phil Pilgrim's conduct to Ms. O'Donnell.

87. Ms. Reisner advised Ms. O'Donnell that Mr. Pilgrim had engaged in insubordination.

88. Ms. Reisner further advised Ms. O'Donnell that Mr. Pilgrim had intentionally failed to appear for a scheduled court session without notifying Ms.

Reisner.

89. Ms. O’Donnell told Ms. Reisner, “just don’t schedule Phil anymore.”

90. Ms. Reisner told Ms. O’Donnell that made her uncomfortable because Mr. Pilgrim was friends with Judge Cuadra.

91. In October 2025, Ms. Reisner learned that attorneys employed by Phil Pilgrim’s law firm were representing defendants in the Suwanee Municipal Court while Mr. Pilgrim simultaneously served as an Assistant Prosecutor for the City.

92. Assistant Prosecutor Richard Armond informed Ms. Reisner that attorney Lindsey McCain had appeared in his office after advising there was a conflict of interest.

93. Ms. Reisner investigated this conflict and learned that Ms. McCain was Mr. Pilgrim’s associate.

94. Ms. Reisner further learned that Mr. Pilgrim's law partner, Jacob Stidham, was actively representing clients in matters originating in the Suwanee Municipal Court.

95. Before conducting that investigation, Ms. Reisner had not known that Ms. McCain and Mr. Stidham practiced with Mr. Pilgrim.

96. Ms. Reisner understood that Mr. Pilgrim’s conduct violated the Suwanee Employee Handbook, the Suwanee City Charter, and Georgia Rule of Professional Conduct 1.7.

97. As Chief Prosecutor and Mr. Pilgrim's supervisor, Ms. Reisner believed she had a duty to report the conflict of interest.

98. On October 17, 2025, Mr. Pilgrim sent Ms. Reisner a text message discussing his financial obligations to his private law practice.

99. In that communication, Mr. Pilgrim acknowledged that serving as a City prosecutor required him to miss opportunities to generate revenue for his law firm.

100. Mr. Pilgrim acknowledged that his private practice generated substantially greater income than his work for the City.

101. Ms. Reisner understood Mr. Pilgrim's statements to demonstrate that his private financial interests conflicted with his public responsibilities.

102. Ms. Reisner further became concerned that Mr. Pilgrim possessed electronic access to all open and closed Suwanee Municipal Court files.

103. Ms. Reisner believed that such access created the opportunity for Mr. Pilgrim to review or alter cases involving clients represented by his own law firm.

104. Ms. Reisner reasonably believed those circumstances created an ongoing conflict of interest.

105. On October 21, 2025, Ms. Reisner reported Mr. Pilgrim's conflict of interest to Ms. Brock, who then called Ms. O'Donnell to convey Ms. Reisner's protected activity.

106. Ms. Brock instructed Ms. Reisner to report the conflict directly to Chief Judge Cuadra.

107. Ms. Reisner advised Ms. Brock that she feared retaliation because Judge Cuadra was friends with Mr. Pilgrim.

108. Ms. Reisner further advised Ms. Brock that she believed reporting the conflict could place her employment in jeopardy.

109. Despite those concerns, Ms. Reisner agreed to report the conflict to Judge Cuadra.

110. On October 22, 2025, Ms. Reisner emailed Judge Cuadra to report Mr. Pilgrim's conflict of interest.

111. Ms. Reisner advised Judge Cuadra that Mr. Pilgrim's continued service as a prosecutor while his law firm represented defendants in Suwanee created an improper conflict.

112. Ms. Reisner made that report because she reasonably believed the conduct violated Georgia law, the City Charter, and the Georgia Rules of Professional Conduct.

113. On October 27, 2025, Judge Cuadra forwarded Ms. Reisner's email to all three Associate Judges, to Ms. Brock, to Ms. O'Donnell, and to Mr. Pilgrim.

114. Judge Cuadra acknowledged in his communication that Mr. Pilgrim's law firm could not continue accepting cases in the City.

115. Ms. Brock advised Ms. Reisner that Mr. Pilgrim would likely resign if his law firm could no longer represent clients in Suwanee Municipal Court.

116. During the week of November 3 through November 7, 2025, Ms. Reisner discovered that Mr. Pilgrim's law firm continued to maintain active matters originating in the Suwanee Municipal Court.

117. Mr. Pilgrim still had not resigned and was already scheduled to work Nov 18 and 20, 2025.

118. Ms. Reisner reported the continuing conflict of interest to Ms. Brock because Mr. Pilgrim continued to violate Judge Cuadra's directive, the City Charter, and applicable professional ethics rules.

119. Ms. Brock contacted Judge Cuadra concerning Ms. Reisner's report.

120. Judge Cuadra informed Ms. Brock that he intended to allow Mr. Pilgrim to continue prosecuting cases despite the ongoing conflict.

121. Throughout November 2025, Ms. Reisner continued to ask Ms. Brock and Ms. O'Donnell if Mr. Pilgrim was resigning.

122. Neither Ms. Brock nor Ms. O'Donnell provided Ms. Reisner with a definitive answer.

123. Because the conflict remained unresolved, Ms. Reisner decided not to schedule Mr. Pilgrim to prosecute cases during December 2025.

124. On November 13, 2025, Ms. O'Donnell met with Ms. Reisner to

discuss the City's process for appointing prosecutors and judges.

125. Ms. Reisner and Ms. O'Donnell discussed that the City had not used a formal reappointment process for incumbent prosecutors in nearly ten years.

126. Ms. O'Donnell advised Ms. Reisner that the City intended to resume using a formal appointment process.

127. Ms. Reisner told Ms. O'Donnell that she intended to continue to serve in her Chief Prosecutor role.

128. Later that day, Ms. O'Donnell sent Ms. Reisner an email confirming their discussion.

129. On November 15, 2025, Ms. Reisner again confirmed in writing that she intended to continue serving as Chief Prosecutor.

130. During this same period, Mr. Pilgrim continued serving as an Assistant Prosecutor despite Ms. Reisner's reports regarding his conflicts of interest.

131. Ms. Reisner prepared the 2026 prosecution schedule and assigned herself and Richard Armond to cover the 2026 court calendar.

132. Mr. Pilgrim resigned on November 20, 2025.

133. Beginning in December 2025, Ms. O'Donnell's demeanor toward Ms. Reisner changed significantly, and she frequently ignored Ms. Reisner in the workplace.

134. During December 2025, Ms. Reisner asked when they would look for

a replacement for Mr. Pilgrim and Ms. O'Donnell evaded the question stating, "we are working on it."

135. On December 9, 2025, Ms. O'Donnell met with City Manager Allen regarding 2026 court reappointments.

136. On December 11, 2025, Ms. O'Donnell privately approached Assistant Prosecutor Richard Armond and asked whether Mr. Allen could call him.

137. Mr. Armond informed Ms. Reisner that Ms. O'Donnell's request was unusual because Mr. Allen had never previously contacted him regarding his appointment.

138. On December 17, 2025, Mr. Allen requested a meeting with Ms. O'Donnell and Ms. Brock to "chat about appointments and stuff. It's complicated."

139. Ms. Reisner reasonably believed that City officials were making decisions concerning prosecutor appointments without her knowledge.

140. The Suwanee Municipal Court was closed from December 22, 2025, through January 5, 2026.

141. On December 23, 2025, Ms. O'Donnell emailed and then texted Mr. Allen that she made a file on Ms. Reisner as Mr. Allen requested and stored it on the H drive.

142. In the file named "Elizabeth", Ms. O'Donell included Ms. Reisner's whistleblower complaints and miscellaneous other documentation Allen and

O'Donell planned to use to pretextually justify terminating Ms. Reisner.

143. During January 2026, Ms. O'Donnell continued responding evasively when Ms. Reisner inquired about hiring a replacement for Mr. Pilgrim.

144. Ms. Reisner informed Ms. O'Donnell that several upcoming court sessions lacked adequate prosecutorial coverage.

145. Ms. O'Donnell expressed no concern regarding those staffing shortages.

146. On January 20, 2026, Mr. Armond witnessed Ms. O'Donnell speaking privately with Assistant Prosecutor Kelsea Wiley about working additional court sessions.

147. Ms. Wiley later advised Ms. Reisner that Ms. O'Donnell had asked about her availability to assume additional prosecutorial duties.

148. As Chief Prosecutor, Ms. Reisner was ordinarily responsible for preparing the prosecutor work schedule.

149. Ms. Reisner had not authorized Ms. O'Donnell to discuss scheduling additional court assignments with Ms. Wiley.

150. Ms. Reisner reasonably believed that City officials were preparing to replace her without informing her.

151. January 27, 2026, was Ms. Reisner's final day actively working for the City.

152. On January 27, 2026, Ms. Reisner observed Ms. O'Donnell meeting privately with Richard Armond.

153. Ms. Reisner waved to Ms. O'Donnell during that meeting.

154. Ms. O'Donnell ignored Ms. Reisner.

155. Afterward, Mr. Armond told Ms. Reisner that Ms. O'Donnell had advised him Mr. Allen would soon contact him concerning prosecutor reappointments.

156. Ms. Reisner was not informed that any decision had been made concerning her own reappointment.

157. The same day, Mr. Allen requested Mr. Pilgrim's phone number for the purpose of rehiring him as a backup prosecutor, in violation of the City Charter.

158. Mr. Allen thereafter contacted Mr. Pilgrim regarding returning to work for the City.

159. Following that conversation, Mr. Allen told Ms. O'Donnell that Mr. Pilgrim was willing to return.

160. Ms. O'Donnell approved the rehiring of Mr. Pilgrim, despite the violation of law and conflict of interest.

161. City officials chose to rehire Mr. Pilgrim despite Ms. Reisner's repeated protected disclosures concerning his conflicts of interest.

162. On January 27, 2026, Mr. Allen asked Ms. O'Donnell if Ms. Reisner

was in court and Ms. O'Donnell affirmed that she was.

163. On January 27, 2026, Mr. Allen called Mr. Armond about thirty minutes before the City Council meeting and offered him Ms. Reisner's Chief Prosecutor job.

164. Mr. Armond rejected the position.

165. Mr. Allen told Mr. Armond not to discuss the offer with Ms. Reisner or anyone else.

166. Mr. On January 27, 2026, the City Council met about court reappointments at their monthly meeting and voted as a block to confirm the reappointment list submitted by Allen and O'Donnell – the "discussion" and vote took less than 2 seconds.

167. Ms. O'Donnell and Mr. Allen explicitly and intentionally excluded Ms. Reisner from the reappointment list presented to City Council yet explicitly and intentionally included Mr. Pilgrim on the reappointment list despite his conflict of interest.

168. Contemporaneous documentation shows that Mr. Allen and Ms. O'Donnell strategized to categorize Ms. Reisner's termination as a term expiration, falsely believing that they could undercut her rights under the GWA and falsely believing that "she didn't have rights to anything."

169. On January 28, 2026, City Attorney Gregory Jay called Ms. Reisner and

told her "the City wanted to go in a different direction and decided not to reappoint" her.

170. Ms. Reisner asked Mr. Jay if this was due to her whistleblowing activity regarding Judge Cuadra and Mr. Pilgrim.

171. Mr. Jay refused to answer the question and said "the City decided to go in a different direction and that is all I can say."

172. Ms. Reisner's employment with the City ended on January 28, 2026.

173. Following Ms. Reisner's termination, the City reappointed Mr. Armond, Ms. Wiley, and Mr. Pilgrim and appointed Alpesh Tailor as a prosecutor at the same time.

174. After terminating Ms. Reisner, the City repeatedly offered Ms. Reisner's former Chief Prosecutor position to Richard Armond who rejected the offers.

175. Following Ms. Reisner's termination, Mr. Allen and Ms. O'Donnell texted each other celebrating their termination of Ms. Reisner.

176. On January 29, 2026, Mr. Pilgrim's associate Ms. McCain was back in Suwanee closing out a case which was still a conflict of interest since Mr. Pilgrim was "reappointed."

177. Mr. Pilgrim's firm also had another case that was pending in Suwanee but was bound over to state court by partner Jacob Stidham and it is still an open

case and a continuing conflict of interest since it physically originated in Suwanee.

178. Throughout her employment, Ms. Reisner repeatedly disclosed violations of law, rules, regulations, and ethical obligations to supervisors designated by the City to receive such complaints and to governmental agencies authorized to investigate those violations.

179. Defendants were aware of Ms. Reisner's protected disclosures before deciding not to reappoint her.

180. Ms. Reisner's protected disclosures were followed by increasingly hostile treatment from City officials, exclusion from management decisions, and ultimately the decision not to reappoint her.

181. Defendants' decision not to reappoint Ms. Reisner occurred shortly after her repeated protected disclosures regarding Judge Cuadra's violations of law, rule, and regulation and Mr. Pilgrim's alleged conflicts of interest, which were also violations of law, rule, and regulation.

182. Defendants' stated reason that the City wished to "go in a different direction" was communicated only after Ms. Reisner engaged in months of protected whistleblower activity.

183. As a direct and proximate result of Defendants' retaliatory conduct, Ms. Reisner lost her employment as Chief Prosecutor.

184. As a direct and proximate result of Defendants' retaliatory conduct, Ms.

Reisner has suffered lost wages, lost future earnings, compensatory damages, attorney's fees, and other damages recoverable under the Georgia Whistleblower Act and the First Amendment.

**COUNT I: RETALIATION**
**Violation of O.C.G.A. § 45-1-4 – the Georgia Whistleblower Act**

175. Based on the facts alleged above, Ms. Reisner asserts a claim for retaliation under the Georgia Whistleblower Act, O.C.G.A. § 45-1-4.

176. At all times relevant to this action, Ms. Reisner was a public employee as that term is defined by O.C.G.A. § 45-1-4(a)(3).

177. At all times relevant to this action, Defendant City of Suwannee was Ms. Reisner's employer and was a "public employer" as defined by O.C.G.A. § 45-1-4(a)(4).

178. Throughout 2025, Ms. Reisner repeatedly disclosed and objected to conduct that she reasonably believed violated Georgia criminal laws, the Georgia Code of Judicial Conduct, the Georgia Rules of Professional Conduct, the Suwanee City Charter, City policies and ordinances, and other applicable laws and regulations.

179. Ms. Reisner reported the fraudulent "fake defendant" scheme orchestrated within the Municipal Court to Robyn O'Donnell on multiple occasions, directly confronted Chief Judge Norman Cuadra regarding the illegality and impropriety of the scheme, filed a complaint with the Georgia Judicial Qualifications

Commission, disclosed the misconduct to City Attorney Gregory Jay, and, at the City's direction, reported the misconduct to newly appointed Court Administrator Kim Brock.

180. Ms. Reisner also repeatedly reported Assistant Prosecutor Phil Pilgrim's illegal conflicts of interest arising from his law firm's simultaneous representation of criminal defendants in Suwanee Municipal Court while he served as a City prosecutor, including reports to Ms. Brock, Judge Cuadra, and other City officials.

181. At all relevant times, Ms. Reisner made these disclosures to supervisors and governmental authorities authorized to receive such complaints because she reasonably believed the reported conduct violated state law, ethical rules, and City regulations, and she objected to participating in or acquiescing to those unlawful practices.

182. Defendants were aware of Ms. Reisner's protected disclosures because they were made directly to her supervisors and other governmental authorities authorized to receive such complaints.

183. Rather than investigate and correct the reported violations, Defendants subjected Ms. Reisner to escalating retaliation.

184. Ultimately, Ms. O'Donnell and Mr. Allen intentionally failed and refused to include Ms. Reisner on the January 2026 reappointment list resulting in

the City terminating her as Chief Prosecutor on January 28, 2026 in violation of the GWA and because of her protected activity under the GWA.

185. Defendants' actions were willful, wanton, and intentionally directed to harm Ms. Reisner.

186. Defendants' actions were reckless and taken in willful disregard of the probable consequences of its actions.

187. Because of Defendants' conduct, Ms. Reisner has and will continue to suffer lost wages and benefits, and other remuneration, damage to her professional reputation, mental and emotional distress, and will accrue attorney's fees, expenses, and pre-and post-judgment interest.

188. Defendants' actions and failures to act were the proximate cause of the harm suffered by Ms. Reisner as alleged herein.

**COUNT II: RETALIATION**
**FIRST AMENDMENT**
**42 U.S.C. § 1983**
**(Defendants Marty Allen and Robyn O'Donnell in their individual capacities)**

189. Plaintiff re-allege the allegations contained in paragraphs 1-186.

190. Defendants Allen and O'Donnell retaliated against Ms. Reisner in violation of her right to freedom of speech as guaranteed by the First Amendment to the Constitution of the United States when Allen and O'Donnell failed and refused to submit Ms. Reisner to the Suwanee City Council for reappointment to her Chief

Prosecutor position in January 2026 thereby terminating her employment with the City of Suwanee for speaking on issues of public concern as a private citizen by reporting Judge Cuadra's, Clerk O'Donnell's, and Clerk of Court Jenessa Cephacile's illegal conduct to the City and providing information to the Judicial Qualifications Commission about Judge Cuadra's illegal acts.

191. Ms. Reisner's speech on issues of public concern was outside of her job responsibilities as Chief Prosecutor.

192. Ms. Reisner's termination is causally connected to her protected conduct.

193. At all times relevant to this count, Defendant Allen was acting under color of state law and within the scope of his discretionary functions as City Manager of the City of Suwanee, Georgia.

194. At all times relevant to this count, Defendant O'Donnell was acting under color of state law and within the scope of her discretionary functions as City Clerk of the City of Suwanee, Georgia.

195. Acting under color and authority of state law, Defendants Allen and O'Donnell violated Ms. Reisner's First Amendment rights by retaliating against her in refusing to include her on the reappointment list and terminating her as Chief Prosecutor.

196. Pre-existing law gave Allen and O'Donnell fair warning that their

actions violated Plaintiff Reisner's Constitutional rights.

197. As a direct and proximate result of Defendants Allen and O'Donnell's unlawful acts, Plaintiff Reisner suffered injuries for which she is entitled to recover equitable relief and compensatory damages, including economic losses and emotional distress, punitive damages, attorney's fees and costs of litigation.

198. Defendants Allen and O'Donnell acted intentionally, willfully, maliciously and oppressively, thereby entitling Plaintiff Reisner to an award of punitive damages to be determined by the enlightened conscience of the jury.

## COUNT III: RETALIATION
## FIRST AMENDMENT
## 42 U.S.C. § 1983
## (Defendant City of Suwanee)

199. Plaintiff re-allege the allegations contained in paragraphs 1-186.

200. City Manager Allen and City Clerk O'Donnell served as the final policymaking authority for all employment decisions regarding Defendant City of Suwanee's employees on a daily basis.

201. As detailed herein, Defendant Allen as City Manager and Defendant O'Donnell as City Clerk conspired to retaliate against and did retaliate against Ms. Reisner for engaging in her right of free speech of public concern as a private citizen under the First Amendment to the Constitution of the United States by refusing submit for reinstatement and terminating Ms. Reisner's employment as Chief Prosecutor because of her protected acts.

202. Ms. Reisner's speech on issues of public concern was outside of her job responsibilities as Chief Prosecutor.

203. Plaintiff Reisner's termination is causally connected to her protected conduct.

204. Allen's acts as City Manager and O'Donnell's acts as City Clerk against Plaintiff Reisner constitute an unofficial custom and policy of Defendant City of Suwanee.

205. Alternatively, Defendant City of Suwanee ratified Allen's and O'Donnell's unlawful acts.

206. As a direct and proximate result of Defendant City of Suwanee's unlawful acts, Plaintiff Reisner suffered injuries for which she is entitled to recover equitable relief and compensatory damages, including economic losses and emotional distress, attorney's fees, and costs of litigation.

## Prayer for Relief

WHEREFORE, Plaintiff demands a **TRIAL BY JURY** and that the following relief be granted:

a. Assume jurisdiction over this action;

b. Award judgment against Defendants and for the Plaintiff;

c. Award Plaintiff economic damages;

d. Award Plaintiff compensatory damages for pain and suffering, mental

and emotional distress, anxiety, humiliation, and any other injury in an amount to be determined by the enlightened conscience of the jury;

e. Award Plaintiff punitive damages against Defendants Allen and O'Donnell in an amount to be determined by the enlightened conscience of the jury to deter Defendants and others from similar misconduct in the future;

f. Award injunctive relief, reinstating Plaintiff, and such other and further equitable relief as is just or, in the alternative, award Plaintiff front pay;

g. Award Plaintiff reasonable attorney's fees, expenses, and costs of litigation;

h. Award Plaintiff pre and post-judgment interest;

i. Award Plaintiff such other equitable and monetary relief as this Court deems just and proper.

## JURY DEMAND

Plaintiff demands a jury trial on all issues so triable.

Respectfully submitted this 23rd day of July 2026.

**LEGARE, ATTWOOD & RAGAN, LLC**

**Cheryl B. Legare**
Georgia Bar No. 038553
cblegare@law-llc.com

125 Clairemont Avenue, Suite 515

Decatur, Georgia 30030
Telephone: (470) 823-4000
Facsimile: (470) 201-1212

Counsel for Plaintiff